Good morning, your honor, your honors. May I proceed? Thank you. May it please the court, I'm here today representing David B. Fenkell in this appeal. This is a appeal of double counting and inconsistencies primarily of legal issues that I'll explain to you this morning. First of all, with respect to the indemnification of the Trachty ESOP trustees, that's a question of moot, because that particular judgment has been satisfied and the Trachty ESOP trustees didn't have to pay anything. 3.25 million dollars came from Chubb, not from the Trachty ESOP trustees. The Trachty ESOP trustees conceded this in their appellate document 32 pages 8 and 9. Also this court- They conceded mootness? Excuse me? I thought this is the main event on this appeal. It is not, your honor. I think there are- Everybody spent an awful lot of time and ink on it. I understand. If you look at pages 8 and 9 of the appellate document, the Trachty ESOP trustees basically say, quote, it is apparent that the court does not need to consider any issue related to the Trachty trustee agreement if it reverses a portion of the judgment requiring Mr. Fenkell to indemnify the Trachty trustees. This money was paid by Chubb. It wasn't paid by the individual trustees. That's a separation issue. Chubb will be subrogated to whatever recovery they have from you, your client. And this is- That's not before us. Well, what is before- What we have before us is the validity of the indemnification order. What is before us, your honor, I would say is the order for any compensatory relief that's required to be paid by the Trachty trustees, and they didn't pay anything. Chubb paid it, not the Trachty trustees. That's moot under Holstein v. City of Chicago, in our opinion, your honor. Your honors, I'd like to move to briefly to the pre-judgment interest issue. This is, again, as I say, a lot of these- the same thing carries throughout these. We're not asking for a recalculation of the interest. We understand that's within the trial court's discretion. It's a request for a review of the analysis upon which the amounts were based. This, again, is a question of law. Judge Conley, on June 4th, 2013, docket 790. Basically, what happened was that this court, in our opinion, should only apply pre-judgment interest to the final judgment, not to a pre-judgment order. On June 4th, 2013, 15 months before four settlement agreements are entered into, and under Bosco v. Surratt, in this court, the Seventh Circuit, settlement before judgment erases the liability of the non-settling defendants. There's a second issue here as well, your honor, and again, Zenith Radio Court v. Hazeltine also provides that the law does not provide a plaintiff to recover a double payment, and again, that's what's happened here. The other thing that we argue on this particular case is looking at Appellate Record 130, we think there's been an abuse of discretion here. Pre-judgment interest is intended to be provided to the class and subclass. We don't have any plaintiffs- they don't have any interest in this issue. Now, what's happening here, Alliance Holdings, who was found jointly and severally liable for the damages in this case to the class and the subclass, is going to receive the benefit of the pre-judgment interest if Judge Connolly's judgment continues, and again, we don't- Well, that's by virtue of the assignment of the claim pursuant to the settlement. That is another- So they stand in the shoes of the plaintiffs and have the same rights that the plaintiffs would have directly against you. It doesn't erase pre-judgment interest. And we think that there's plain legal prejudice in that respect because of the assignment. We don't think the assignment is valid. Right now, I'm just saying the calculation of interest and providing the interest to Alliance, who's a joint co-tort feeser here, doesn't make any sense. The issue, I believe you raised, Your Honor, was one of the assignment and the validity of the assignment. On that issue, we believe that there's plain legal prejudice because what's happened, and going back to what you said earlier, Your Honor, Chubb now has a bite at the apple. We've got three bites at this $3.25 million apple. The Troctee trustees have that responsibility. Then Chubb makes the payment. Now Chubb's got the subrogation right against Mr. Fenkel, and now on top of that, we've got Alliance getting a bite at the apple. But counsel, how does Chubb have any right to come against Mr. Fenkel? Subrogation means that Chubb can go and get the payment back from anyone who receives the payment, not from the payor. Maybe that's true, Your Honor. It could be true that Chubb doesn't have that right, but we're going to have to defend that issue. That's what potentially happens here, is we've got a lawsuit from Chubb, we've got a lawsuit with Alliance Holdings, and we've got two different obligations here that we have to defend now. That's how this was changed, and that's how there's plain legal prejudice. On top of that- How is that possibly plain legal prejudice? Your client has not lost any rights? Your client had. That is what constitutes plain legal prejudice. Not that there might be factual prejudice. I'm not arguing about factual prejudice, Your Honor. I'm arguing about a dispute that also exists as well in the Third Circuit. We've got an Eastern District of Pennsylvania case going on right now, and what's essentially happening here is an attempt to backdoor a contribution and indemnity responsibility on Mr. Fenkel in this case that they're going to use in the Third Circuit. You just said that issue is moot. Which issue? The indemnity issue. The indemnity issue with respect to the Trachtee sub-trustees is moot. That issue should be gone right off the bat because they didn't pay anything. There's another issue as to the assignment which you raised, Your Honor, and they've assigned that claim and other claims to the Alliance Holdings, who's the co-joint tort fees are here. But going back to your mootness argument, how is it that you find that the indemnification issue is moot only because someone else paid as opposed to them? That's what the law says. The law says, in our opinion, that what the judgment was was for any compensatory relief that's required to be paid. There wasn't any compensatory relief that was required to be paid by the Trachtee sub-trustees here. It was paid by Chubb, so it should be done. And that's what the Trachtee trustees say as well. Well, the trustees were required to pay it. The fact that they had insurance is, you know, from a third party, that's a collateral source rule, doesn't expunge their liability. They were required to pay. They did pay, albeit via a third-party payor insurer who's now subrogated to the claim for indemnification. So, you know, money is fungible. It's going to all flow and has flowed to the plan, right, or the plan beneficiaries. This isn't going to get your guy off the hook. Your Honor, the collateral source rule, in my opinion, does not apply here. The Tenth Circuit indicated in a case for contribution and indemnity, and it's cited in our brief that the collateral source rule has no place in this case, and we adopt that view. I understand you'll make your own decision in that respect. So I don't think that has any place here with respect to this issue. What public policy are you identifying that would make, would call the indemnification into question? The indemnification, the indemnification of the tractee, the sub-trustees that's been assigned. The policy basically is that mootness, one of mootness. This case, you can't, once there is no, once, if you look at city of, or Holstein v. City of Chicago, when one party, one of the parties to the case loses a personal interest in the case, it's moot. How would we have, we're basically reversing the whole concept of mootness if we allow this to continue in this particular case. That's the policy that I'd focus on, Your Honor. If I would, I'd like to point, get to another couple of points, because I've got six, and I'm sorry I've got so much to cover this morning. The other one on double counting that we think is the windfall argument. This is a question of law. It involves the legal analysis with respect to the appropriateness of awarding the full value of the subclass accounts in the context of the factual findings. So we're taking the factual findings as true. We didn't challenge those factual findings. The factual findings are that there was one $8.3 million overpayment. It also, the factual findings at appellate record 118 make it clear that Judge Conley didn't focus on what happened to the value of the stock after the transaction in August 2007 occurred. So there isn't any, the Great Recession isn't at play here, the performance of Chokde after the transaction isn't at play here. It's simply the $8.3 million. So how, in a mathematical calculation, can you get to two judgments of $7.8 million for the subclass and $6.4 million for the class out of an overpayment on a quote unquote prohibited transaction of $8.3 million? We don't see how you can get there and we think that in the judge's own documents and also at our appeal, docket 53, pages 34 and 35, we explain very clearly, together with the appellate record at A118, we explain very clearly that you've got to have some kind of apportionment of that, of the $7.8 million that's related to the purchase price over the excessive purchase price that Judge Conley determined of $8.3 million and we think the easiest way to do that, cutting aside all the math in the brief, is to look at the $8.3 million overpayment, quote unquote, and the $6.4 million judgment to the class and that creates a percentage of 22.631 percent. If you multiply that times the $7.8 million or the $8.3 million overpayment, that's the portion that we believe, the 1.893 million, is the portion of the $7.8 million that really is not a double counting. Otherwise, we think there's a double counting here and this is a clear issue of double counting and double damages. The $29 million, if you take the $38 million under A100 as the purchase price, and it's really unclear in the judge's opinion, but if you take that as face value, page 3, docket 790, you take that, you subtract out the $8.3 million, you get $30 million of value that we know was not subject to question by Judge Conley. He said it doesn't matter what happened to the great tsunami that occurred after the transaction occurred. So we're talking about $8.3 million. How can you go from $8.3 million to a $14.2 million of damages and we think there's been a clear error, major inconsistency in the district court's opinion in this respect and we ask you to overturn that. In the public policy- Why is it that this isn't two separate remedies for two separate harms? Excuse me, I'm sorry, Your Honor, I didn't hear that. Why isn't this two separate remedies for two separate harms? I don't think, well, that does injustice to the concept of ERISA prohibited transactions. Again, how are we going to have fiduciaries understand what they have to do and don't have to do if they can have an $8.3 million overpayment turn into $14.2 million worth of damages? I don't understand that. That's the argument we're making. Except that one would be overpayment, right? Yes, ma'am. And then the other is the restoration payment. So they're two separate harms coming out of the transaction that require damages. So how is that a windfall or double counting? I don't think that, we disagree with Judge Connolly. We disagree with the view you just expressed. We think that you can only get to $8.3 million if there's been a prohibited transaction where the ESOP paid more than fair market value in the amount of $8.3 million. We don't see how you can calculate $14.2 million worth of damages out of that $8.3 million payment, no matter how you skim the cast. If I could go back to the indemnity issue for a moment. Yes, ma'am. Are you now relying entirely on this mootness argument? I'm relying, no, there's two parts of the indemnity that I think I'm arguing this morning, or we're arguing in our briefs. The first is the mootness, and mootness is the threshold issue. If you don't agree with our mootness argument, which we think you should agree to, then we go into great depth in the case law about why Mertens and Russell applies. Right, and that's the point I raised at the top of the argument, and you're not spending any of your argument time on this issue, which it seems to me is the most difficult legal issue in the case, because there's a circuit split on this. I do understand that, and that's why we're here. And there's been Supreme Court cases in the interim of the dispositive decision, or what might be the dispositive decision in our circuit, which may have changed the landscape here. You haven't spent any time on that. Maybe you're resting on your briefs. That's fine. It's up to you how you want to spend your argument time. I'm not resting on my briefs, but I've got six points to cover, and I was just trying to cover them. But, Your Honor, I will focus on the issue, which I know is really significant for this Court and for this country. Okay? First of all, on the indemnification issue that you're pointing to now, assuming you don't agree with our mootness argument, which I think is a strong argument, and this Court should. I got that point. Thank you. Your Honor, Free v. Briotti is distinguishable here. First of all, Free came out in 1984, this Court opinion. One year later, Massachusetts Mutual Life Insurance Company v. Russell came out, Supreme Court case. It basically, implicitly, in our opinion, made us focus on Free not being of any real value as it was, because it occurred after the fact, and the Supreme Court focused on the remedies under ERISA that will not be implied unless they're consistent with the statutory framework. And under 502A, there's six carefully integrated civil enforcement provisions in ERISA section 502A. They provide strong evidence that Congress did not intend to authorize remedies that simply forgot to incorporate. I think that's been supported in the Eighth Circuit in Traveler's Casualty v. Ada. In the Ninth Circuit, Kim v. Pukajawa. And then if you look at Mertens, which we think Mertens came out two years after Chemung. Chemung can be done away with when you look at Mertens, which is a U.S. Supreme Court opinion which says that ERISA section 503A does not provide for recovery of compensatory relief, whether for ERISA breaches by a co-fiduciary, a co-ERISA fiduciary, or a non-fiduciary. And I think that it's very clear that Chemung doesn't, and it's a Second Circuit opinion, Chemung doesn't withstand after Mertens. And I also think that the cases that are in this circuit can be distinguishable. I think, for example, Limekeuler is one of the cases that might have been cited by Alliance, and I think it's distinguishable because the three exceptions don't apply in this case. Also, going back to free for a minute. But counsel, didn't Mertens deal with direct claims by beneficiaries against non-fiduciaries, and didn't at all deal with the indemnification issue that we have here? Didn't at all deal with? The indemnification issue. No, I think it did deal with the whole issue of contribution and indemnification between co-fiduciaries, whether or not they're co-trustees, co-ERISA fiduciaries, or non-fiduciaries. And in this case, we have a non-fiduciary. Mr. Fenkel was not a fiduciary of the Tracte Aesop. There's no court finding. Wasn't he a functional fiduciary? Not of the Tracte Aesop. He was not a functional fiduciary of the Tracte Aesop. Mr. Fenkel was not found to be an ERISA fiduciary of the Tracte Aesop. That's our opinion of the court's findings in that respect. The basis of the fiduciary breach liability holding, which you have not contested here, is that he was a fiduciary of the Alliance Aesop, which the Tracte beneficiaries were folded into and then later spun off. So his fiduciary duty breach flowed from that relationship. He betrayed their trust while they were members of the district judge was very clear and thorough in his decision on that score, and you haven't even challenged it. So his fiduciary status is established, so that kicks out Mertens. Russell's in the case, obviously, because it states some general principles that have a bearing on the continued validity of free. The Second Circuit's case in Chemung was after Russell. We've got an Eighth Circuit decision, a Ninth Circuit decision, so we've got to resolve whether free is still good law. So maybe you can focus on that. Thank you, Your Honor. I appreciate that opportunity. Free is not good law, first of all, because of Russell. We think it implicitly overturns free. Secondly, we think it's distinguishable in a number of ways. First of all, free involved co-ERISA fiduciaries of the same plan. Again, we take the position that Mr. Finkel was not a co-ERISA fiduciary. Before you get to trying to distinguish it, which is sort of a little bit on the issue of whether Russell implicitly displaces free, based on the general principles that it announced with respect to implying claims that aren't there, or causes of action that aren't there. We don't really have that going on here. The District Court didn't create, and free didn't create, a new cause of action under its common law powers to construe ERISA. It interpreted Section 1109, and that's the breach of fiduciary duty provision, and its grant of broad equitable authority to courts to grant appropriate relief as consistent with basic principles of trust law, which include indemnification among co-fiduciaries, depending on culpability. So how is that an incorrect interpretation of Section 1109? I think that it may be a correct interpretation of Section 409, which But I think you have to allow one, then, to look at the facts of the case. Okay, so you're going to just distinguish. And distinguish free, because it doesn't apply, and I think we made it very clear, and I was going into that, that free has to be distinguished. The other point I'd make, Your Honor, is that none of the provisions that authorize a right of indemnification or contribution in Section 502A2 are at play here, in my opinion, in what we described in our brief. There's no, we've got in free, we've got an indemnification of a passive non-feasant fiduciary as against an actively breaching ERISA fiduciary. There's nothing in 502A2 that says that you can provide an indemnification or contribution remedy against those types, under those types of circumstances, in our opinion, and that's what we've made it clear in our brief. And I will say, I will leave you with that, again, that free's co-ERISA fiduciaries are the same plan. Trustees seeking indemnity was only a passive trustee in free. These trustees, if you look at appellate docket 353, pages 14 and 15, March 6th of 2015, there's two pages worth of conclusions that were taken from Judge Conley's opinion that said that the Trachty trustees were responsible. So they're not a passive trustee here. Well, right, there would be no purpose for an indemnification order if they weren't. Right, but free stands for the proposition that if you've got one passive trustee and you've got one active trustee, that that's where the passive trustee gets the indemnification. We can't call the Trachty trustees passive, not based upon this ruling in this case. Well, the district court viewed this as an exercise in allocation of the most culpable for the wrongs that were committed here. And that the culpability of the Trachty trustees was much diminished by comparison to what your client did. But this isn't a battle between the Trachty trustees and Mr. Fenkel right now. It's a battle between Mr. Fenkel and Alliance. And Alliance was jointly and severally liable, found liable. They were equally liable with Mr. Fenkel, Your Honor. The, if I may, a couple of more issues because I know I'm going to run out of time here. The attorney's fee issue, again, well actually, yes, I'll go to the attorney's fee issues in the CrossFit field because I think that's the only two I haven't covered so far, Your Honors. The attorney's fee issues, there's substantial briefing below. Again, docket 53 pages, or not below, but summarized in our appellate docket 53, pages 40 and 41. This is the one that's on an abuse of discretion. And again, I think there's essentially double counting here because we're talking about, well, excuse me, I'm sorry. Here we're talking about whether or not there was success on the merits. I apologize. The, under the Hart v. Reliance Standard Life Insurance Company case, the final judgment in this case has four parts. The first part would be the, if you assume that our windfall argument applies, instead of $7.8 million of damages, we've got $1.9 million of damages. Even if you assume you don't, you do not agree with our prejudgment interest argument, which we think you should. The, you add the $1.9 million adjusted for the $7.8 million award to the $1.9 million of prejudgment interest. You subtract out the $7.7 million of payments, and we've got a negative $3.8 million. There's no liability for Mr. Fankel. So there is no success if that's what this court determines today, or How did you not waive this issue? We didn't waive this issue because we briefed it at, we briefed it at DACA's 938 and 973 below. We went to the fairness opinion hearings, the settlement hearings, at which the fairness of the settlement agreements was to be determined. We made these arguments there, and then rather than coming up with a final judgment, that then you'd have an attorney's, an opportunity to respond to the attorney's fees award, because we didn't know what it was. Up until that point, we didn't know how attorney's fees were going to be allocated at that fairness opinion hearing on July 24th, 2013. So the judgment comes out, and the allocations occur in the final judgment, and then we don't have the opportunity, we asked for it in our briefing, and we asked for it at the hearing, the opportunity to, after we understood what the attorney's fees were going to be, to make the additional challenge. We don't think the specificity was there in order to make the challenge. But didn't the district court take full briefing on the attorney's fees award? It took full briefing, but that was during a period of time at which we were entering into four different settlement agreements, and we were trying to figure out what attorney's fees were being ahead and ruled on them and included that in the final judgment, and we did ask for and reserved our right to challenge that once we knew what the court was going to say about the attorney's fees. Yeah, but shouldn't you make these objections to the attorney's fees before the court rules? So you look at the fees, you determine which fees are reasonable, which ones are unreasonable, and make your argument that you shouldn't be liable for the attorney's fees because there was no success on the merits, and do it then. Our position was we couldn't do that until we went, until after we got the court's review of the settlement agreements, and then we understood what the arguments were. We didn't think there was enough specificity. We took that position at the fairness hearing. We also took it after the fairness hearing, Your Honor, and before. Your Honor, one last point. I see my time's about up here on the cross appeal. This is another matter of double counting. The plaintiffs are going to ask for the same attorney's fees that were taken out of the common fund, the 1.13 million worth of attorney's fees that came out of the common fund. Judge Conley made a decision. This one we agree with. In his discretion, he said that those common fund attorney's fees couldn't also be granted under section, ERISA section 502G. We agree with him here. We also agree with him on the cost, the issue of costs. There was $1,068,000 of costs, of which $676,639 came out of the $5.325 million of attorney's fees that the remainder was granted and awarded out of the common fund. How can you get more than a million dollars of costs? It's already been granted. So the fees, the 1.1 million of fees and the costs have already been paid. It's another issue of double counting, in our opinion. Before you sit down, I'd like to make one point of clarification or a point of clarification from you on the mootness of the indemnification argument. You're asking for reversal of that aspect of the order? We are, Your Honor. And how can it be moot? If it's moot, we can't grant relief. I'm going to have to come back to you on my six minutes of rebuttal and respond to that, Your Honor. Okay. Thank you. I appreciate... You have very little time left. Excuse me? I think I'm out. No, you're not. You are now. I am. Thank you, Your Honors. I appreciate the opportunity to be heard today on behalf of Mr. Finkel. Thank you. Mr. Barton? May it please the Court. I'm Joseph Barton. I represent the plaintiffs in class at this appeal and also at the trial level. To avoid overlap or to avoid duplicity... Sorry, duplicative nature of the arguments, and because we have overlap in our briefs, we've divided up the arguments between myself, counsel for Alliance, and counsel for the trustees as follows. The plaintiffs intend to address Mr. Finkel's lack of standing to object to the settlements and the issue with respect to attorney's fees. Counsel for Alliance will address the issues related to remedies, that is, the restoration, prejudgment interest, and indemnification, and plaintiffs will adopt those arguments by Mr. Jackson on behalf of Alliance. And then the tractee trustees are going to address issues specific with respect to the trustees' settlement. As you noted, one of the things that is not an issue here today is Mr. Finkel's liability. The other thing that is not an issue, has not been appealed, is the injunction that the district court imposed removing Mr. Finkel permanently as the trustee of the Alliance ESOP. Those two issues have not been appealed. This case comes to the court after two trials and lengthy decisions with findings of fact and conclusions of law. As your honors noted, the district court found that Alliance, the trustees, and Finkel breached their fiduciary duties and engaged in prohibited transactions. The district court also found that Mr. Finkel was the most culpable, and he orchestrated the trustees, while others are mere musicians. Even though there is not a specific finding that Mr. Finkel was a de facto trustee of the tractee ESOP, the factual findings that the judge found certainly support that, and I think by inference, if not explicitly, Mr. Finkel was a de facto fiduciary of the tractee ESOP as a result of the control that the court found that he exercised over those trustees. It does not matter that he was not a named or official fiduciary of the tractee ESOP. That was merely the artifice that he created in order to control the transaction and make it appear as if there were independent people, when in fact there was not. Counsel, do we need to find that Mr. Finkel was a functional fiduciary in order for us to find that free is still good law? Your honor, I don't believe so. I think that that is not something that you need to find. Mr. Jackson, for Alliance, will specifically address the indemnity issues, but I think that is supported in terms of allocating liability among fiduciaries. It's supported by the trust law, and it's supported by good policy, and particularly as it applies to this case. As the record indicates, one of the reasons that we settled with the tractee trustees and the nature that we settled was essentially for the remainder of all their insurance, that they had no other significant assets, but one of the things that we were able to get was their indemnification claim and take that and apply it to get additional consideration from a perspective of a statute like ERISA that is designed to protect the participants. Allowing an indemnification remedy against certain fiduciaries who have one, who have limited assets against a more culpable, more solvent defendant, is a good public policy. The remedies that were imposed in this case matched what the plaintiffs alleged and what the court found was wrong in the case. The transaction, though a complex transaction with 11 different steps, really boils down to three things. The Alliance ESOP accounts of the tractee employees were transferred over to the tractee ESOP, and their Alliance stock was exchanged for tractee stock. The tractee ESOP then purchased the remaining shares from Alliance and its minority owner, Pagalo, and there was a phantom stock payment that was issued to Mr. Pagalo. The issuance of that payment, the payment that was made and the price, was dependent on the price of the transaction. And the court was asking the question, or Mr. Frenkel's counsel was raising the question of how could there be one overpayment and multiple harms. And the answer to that is the overpayment really results, it comes from the overpricing of the stock, and because multiple steps in the transaction were influenced and directly dependent on the price that was determined, they influenced the transaction in multiple ways, causing multiple harms. One example of that is because of the nature of the share exchange, the price at which Alliance shares were exchanged for tractee shares, because there was an overpricing of the stock, it meant that people got, the participants received for their Alliance shares, too few shares. As a result of that, that then had an impact on the amount that they had to purchase, that the tractee ESOP then had to purchase. They had to purchase more shares using debt by the tractee ESOP than they would have otherwise had they been given the correct amount of the shares in the share exchange. Similarly, with respect to the phantom stock payment, that also, the incorrect share price increased the amount that was paid as a result of the phantom stock plan. We allege, and the court found, that that phantom stock payment never would have been made in an arms-length third-party transaction. But even if it had been made, it was made at the wrong price because the amount of that payment was dependent on the price that they actually used in the transaction. So all of these things had a domino effect. The court then had five remedies. One was to restore the Alliance ESOP accounts, and the amount that was ordered to be restored in the remedies order, which Fenkel and Alliance were jointly and several liable for, was $7.8 million plus prejudgment interest, which amounted to $9 million. And we understood that as we negotiated the settlement with Alliance. The second was to remove Fenkel as the trustee. There was also an order requiring Fenkel to scourge the $2.9 million, which the court ordered to be paid to Tractee, the company, rather than to plaintiffs, though that's what we had sought. And then he required the trustees to pay $6.4 million plus prejudgment interest to the Tractee ESOP. And then also the order requiring Alliance and Fenkel to jointly and severally indemnify the trustees for whatever they were required to pay. We then entered into three settlements. One in full with the trustees in Pagalo, one in full with Alliance, and the third in part with Fenkel. None of those settlements resolved our claim for fees as to Mr. Fenkel. The claim for fees with Mr. Fenkel was explicitly excluded out of his settlement with respect to one small portion, and that had to do with specifically fees related to the Phantom Stock Award. Those amounts were excluded from our fee petition. And that resulted in settlements of $12.5 million plus another $5.35 million in fees and costs that they paid by Alliance. The court found that the settlement was fair and reasonable under Rule 23. The sole objector to the settlement was Mr. Fenkel. He made no showing of legal prejudice down below. Plaintiffs submitted, well actually technically, plaintiffs submitted a claim for fees under 502G, the statutory award for fees under ERISA. Class counsel sought an award of fees to class counsel. And plaintiffs sought an award of fees under 502G and costs, and we also sought an award, and I'm talking about plaintiffs, I mean my clients in the class, an award under 504D for whatever had not been paid by Alliance, or there was an amount that the tractee agreed to pay in negotiating the amount that we had recovered for the company. In his objections, Mr. Fenkel did not cite part the correct Supreme Court standard. He argued down below that we were subject to a prevailing party standard, and that unless we could show that we achieved final judgment and that we were a prevailing party, we were not entitled to fees. That was the argument that he made. Even when we pointed that out to him in his reply, he did not change that argument at the hearing. He did not address the five-factor test. He did not address the substantial justification test. And he did not object to the amount of our fees in any other way than to say it was per se unreasonable. He did not do that in his briefs. He did not do that at the oral argument. That is not a proper objection. That argument as to the amount of our fees was waived. The district court found that our fees were reasonable, and we submitted multiple pages of lengthy briefs and numerous attachments, including affidavits from attorneys that practice in ERISA and do ESOP cases, as to the reasonableness of the rates, and we detailed the reasonableness of our times. There was no specific objection to any part of those amounts. What the district court did was to grant the 502G award, but only in the amount necessary to pay the additional fees that were awarded under 23H. The court refused to award fees sufficient to reimburse plaintiffs in the class for the amounts that had been paid to counsel. Fenkel did not object to our costs and our request for costs, and he does not, in his briefs, make any arguments as to our costs here. I think the question of Mr. Fenkel's standing can be relatively easy dealt with. The general rule applies. The general rule is that non-settling defendants, including in class actions, do not have standing to object to settlements unless they show legal prejudice. That means interference with the non-settling defendant's contractual or legal rights. There is none here. There is no difference. All we did was assign claims that we already existed. Mr. Fenkel's attorney made the argument that there would be secondary litigation. The only secondary litigation would be a collection action against Mr. Fenkel. If Mr. Fenkel didn't pay the judgment, we would be pursuing that action. With respect to our cost of claim for fees, Mr. Fenkel wants to portray this as double counting. It is not. Class counsel is not seeking additional fees. I am here seeking fees for my client that they paid to me out of the common fund. This is not double counting. This is seeking an award of fees and costs that ought to be reimbursed to the class. The Seventh Circuit and Supreme Court law is clear. The right to fees under a statutory fee award belongs to the client. They have a right to obtain those fees regardless of how they paid for them or whether they even paid them. If a client that pursues it with pro bono counsel can obtain an award of fees, a client that pays on an hourly basis can obtain an award of fees, there is no reason why class cannot obtain the same out of a common fund recovery. Thank you. Thank you, Mr. Borden. Mr. Jackson. Thank you, Your Honors. Chuck Jackson for Alliance Holdings and for the Alliance PSOP. In this case, Your Honor, Alliance did the right thing. During the events at issue, Alliance was controlled by Fankel. The evidence of Mr. Fankel's violations of ERISA is overwhelming and undisputed in this court. After the district court's liability ruling, Mr. Fankel left Alliance. Alliance disassociated itself with Mr. Fankel and settled with the plaintiffs. Alliance's settlement unquestionably fosters ERISA's objectives. Despite being the most culpable party, Mr. Fankel tried in the district court and he's trying again in this court to free ride the settlement down below. He said four or five, counsel said four or five times that we want duplicative remedies and we're trying to enforce duplicative remedies from the district court. That's simply not true. The district court made specific, very specific fact findings in this case. In the restoration award, I should point out, let me start with that. The restoration award, let's talk about what it was. It was to restore to the participants in the ESOP that then existed at Alliance, their value, something north of $7 million, which was lost in this case as a result of Mr. Fankel's privative transactions. Those participants are injured. That money is to come back under the district court's award and to compensate those individuals who lost their savings or retirement savings. And I point out that the average of the 319 individuals in the class, putting aside Mr. Pagelow's very large retirement benefit, the average is just around $20,000, a very modest retirement savings that was lost as a result of Mr. Fankel's privative transactions. So that harm to those individuals and to those class members is entirely distinct from the award that was based upon, that we're talking about, the indemnification and the overpayment award. The overpayment award that Trocty paid too much for this stock is a harm to the class, and that's an entirely separate remedy from the remedy to the subclass, whose accounts were restored under the district court's order. Under normal principles of law, you get prejudgment interest on an award. The money's been gone. Mr. Fankel took the money. Excuse me, on the restoration side, the money's been gone since 2007. Prejudgment interest just compensates the class members for the time value of money in the meantime. So we believe the district court was entirely appropriate and on all fours in awarding prejudgment interest to the subclass. Now, to the issue that prompted more questioning from Judge Sykes as well as Judge Ellis, we don't believe there's a split in the circuits on this one. Brody was an early decision. It was 1984 or so, but we believe Brody got it right. As between fiduciaries, we think Brody got it exactly right, that there could be a right of indemnification or contribution. Judge Ellis, you asked if that right would also apply if Mr. Fankel were not a fiduciary. For the reasons Mr. Barton outlined, he was. He had every characteristic of a fiduciary. In the district court's colorful language, he was the orchestra leader. The Trachty trustees were the mere musicians in this thing. They did what he told them to do. But we think even so, you don't have to be, and I don't think the court needs to reach this, but we don't think that Mr. Fankel has to be a fiduciary. Under Brody, the court looked for its source of law in terms of should it award contribution or indemnification, and contribution being a subset of indemnification. The court in Brody, we think pre-essentially, given it's been so many years, found that ERISA gave a right to contribution and indemnity. It got there based on several criteria. Number one, under section 1105, co-fiduciary liability, that's section of ERISA. ERISA itself looks to allocation of responsibilities. Fiduciaries can be relieved of liability as to co-fiduciaries in certain circumstances. That wasn't the statutory basis for the court's decision. It then went to 1109. Because it had to. Section 1105 had not been invoked in that case. Right. It went to 1109, and then 1109 talks about complete relief and finding the individual or the fiduciary who can be held personally liable for what that individual did. And the court, I think, got support from its decision based upon 1109's designation of individuals who can be personally liable. The court also went on to look at legislative history and trust law. And trust law, of course, squarely says you can get indemnity in a case like this. Right. And the Second Circuit in the Chemung case basically agreed, undertaking the same sort of analysis, but the Ninth and Eighth Circuits go the other way more recently and based on a more textualist interpretation of the statute and based on the Supreme Court's decision in Russell about not implying remedies that aren't there. I agree. So you're going to have to grapple with that. I'm going to that next. The court, to be sure, there are a couple cases out there that address the issue and come out differently. That's the definition of a circuit split. We think there really isn't one, and I'll tell you why. Since those cases were decided, a couple of things have happened. The Supreme Court in the Verity case ruled that remedies for fiduciary breaches can also be had under 502A3. We're not confined to 502A2. Then the court ruled even more recently in the Cigna v. Amara case where the court went through a litany of remedies that were available before the courts in equity. There were remedies in addition to disgorgement and restitution. There was even a remedy called surcharge, which looks very much like monetary damages, but it's available at equity. The court said in the appropriate circumstances that could be available. What does that do in this case? What it tells us is we look to trust law to understand what the scope of remedies might be. The Briody case is exactly on point in that respect by looking to trust law and trust law's affirmation that fiduciaries can be held liable for indemnity. The rule makes enormous sense under ERISA, and the reason here is reflected by this case. The court below found that these Trachty fiduciaries were manipulated. On these specific facts, they were manipulated, and they were controlled by Mr. Fankel. It was his show from beginning to end, and he was the most culpable party. So is it a positive policy? There were questions from the court about public policy reasons for going this way. Is there a positive policy for Mr. Fankel just to stand and say you can't get me somebody else already paid? That's not a positive policy. It doesn't deter bad conduct with ESOPs and ERISA generally, and by having a right of indemnity, the less culpable violating fiduciaries versus the most culpable violating fiduciary we think makes eminent sense and is completely consistent with ERISA's text. Counsel, do you think that the Supreme Court in LaRue limits the scope of Russell's planned benefit language? Well, thank you for raising that. Russell was a defined benefit plan where the plaintiff brought a lawsuit for extra-contractual damages. The remedy sought in that case didn't have any... It was beyond the plan. It was to punish somebody for not doing something they were supposed to do with respect to the plan. Here, the plaintiffs and our alliance, derivatively because we were assigned their rights, they're seeking to enforce the plan. They're seeking to enforce ERISA. So I think it's completely consonant, and LaRue, I think, supports our position on that. So with respect to... I do have to make one point, which I think makes further support for an indemnification remedy here. Mr. Fankel cites the Summers v. State Street case and says that that case brings Brody into question. Two things about that. Number one, this court has its own precedents which say that even if other courts are against our position, we're not going to walk away from a decision unless there are compelling reasons for doing so. Mr. Fankel is the wrong person to talk about walking away from settled precedent in this court. Second, with the Summers v. State Street case, there's just passing mention of contribution, and I don't think Brody is even cited in that case, but there's passing mention of contribution in the context of a settlement bar to litigation. So that discussion is very limited, it's very narrow. But what's more compelling about the Summers v. State Street case is the court's discussion of the stock price plummeting of the United Airlines and not just stopping there. The court looking at debt-equity ratio of a company and making the very now obvious statement that the higher the debt, the less the company is worth. In that case, it was a public company. In this case, it's a private company. And the debt-equity ratio was too high to begin with. Mr. Barton argued that Trotty overpaid for the stock significantly, but the worst part is that Mr. Fankel took the equity out himself through virtue of the phantom stock plan. So this case cries out, we believe, for an indemnification remedy based upon the narrow facts of this case. The court doesn't have any further questions? Thank you, counsel. Thank you, counsel. Mr. Wolff? May it please the court, at this point in this protracted litigation, the Trotty ESOP trustees have no stake in the vast majority of the disputed issues that have been discussed so far today. The Trotty trustees' sole focus is on whether this court will affirm Judge Conley in his approval of their settlement with the class. You have no stake in the indemnification order? That's correct. Any rights to the indemnification remedy in that judgment now belong to the alliance defendants, Mr. Jackson. Mr. Fankel did not make a proper objection to our settlement in the district court, and for that reason alone, he's waived his rights to complain to this court. His concern about the settlements is focused and always has been focused entirely on the fact that the Trotty trustees' indemnity rights have been assigned to the alliance defendants. His reply brief at page 60 makes this point quite clearly. So you do have a stake in the appeal to the extent that you want that argument defeated? I don't believe we do have a stake in it. You don't want us to unsettle the settlement, right? That's correct. And he wants us to unsettle the settlement. That's correct. So your presence here is not pointless. That is certainly correct. But the point I was trying to make, perhaps inartfully, is that we really don't care whether you reverse the judgment that gives indemnification rights to the Trotty trustees. Right, you've assigned away those rights. That's our point. So the assignment to the alliance defendants that we're talking about, that's not even part of the Trotty trustees' settlement, which only assigned those rights to the class. So it's not a basis for objecting to the Trotty trustees' settlement. Now, the district court held, and we believe we've shown, that Mr. Finkel has no standing to complain about our settlement, no plain legal prejudice. But even if Mr. Finkel does have standing and hasn't waived his rights, he needs to show that the district court abused its discretion in concluding that the settlement was fair, reasonable, and adequate under Rule 23. The district court correctly concluded that he's free to make any arguments he wants to at a later date. They need not be resolved in order to approve the settlement. And he's not even attempted to argue in this court that the district court abused its discretion in approving the settlement. It's not sufficient for him to simply argue that he has standing to object and to expect that this case will be remanded for further argument below. Any delay in the implementation of our settlement with the class would be manifestly unfair to my clients and to the class. It's been over two years since we reached an agreement in principle to settle this case, and it's time to end it. And your client's portion of the settlement was funded by insurance? Yes. So there will be a segregation claim? Or we can expect that there will be one? There's nothing on the record to show that Chubb... We know very little about the insurance... ...any rights whatsoever. And as Your Honor pointed out earlier, it's not really part of this case. So if there are no questions, further in conclusion, we respectfully request that the court affirm the approval of the Trachty Trustees Settlement Agreement. Thank you. Thank you. Thanks to all counsel. The case will be taken under advisement.